IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| POLAR ENVIRONMENTAL TECHNOLOGIES, INC., <br><br> Plaintiff, <br><br> vs. <br><br> RUST-OLEUM CORPORATION, <br><br> Defendant. | No. 4:20-cv-0017-HRH |

O R D E R

Motion to Dismiss

Defendant Rust-oleum Corporation moves to dismiss plaintiff Polar Environmental Technologies, Inc.'s first amended complaint.[1] This motion is opposed.[2] Oral argument was not requested and is not deemed necessary.

---

[1]Docket No. 18.

[2]Docket No. 22.

Background

Plaintiff "is engaged in the manufacture and sale of certain flexible treading [p]roducts for . . . horizontal surfaces such as stairs and floors. . . ."[3] Plaintiff's products include Extreme Grip and Lava Grip.[4]

Plaintiff alleges that "[o]n or about February 1, 2016, the Parties entered into an Exclusive Sales and License Agreement ('Agreement')[.]"[5] The Agreement provided that "both Rust-Oleum and Polar desire to explore the value of the Products in the Market. . . ."[6]

Under the terms of the Agreement, plaintiff "agree[d] that during the term of" the Agreement, "it [would] not sell or otherwise distribute the Products to any other persons or entities, other than Rust-Oleum, for sale in the consumer retail and industrial distribution channels and entertainment industry direct . . . ('the Market')."[7] Defendant "agree[d] to purchase from Polar not less than FIVE HUNDRED THOUSAND DOLLARS ($500,000.00) of Products each year during the term of th[e] agreement."[8] The Agreement provided that

---

[3] Exclusive Sales and License Agreement at 1, Appendix 1, First Amended Complaint, Docket No. 14.

[4] Id.

[5] First Amended Complaint at 2, ¶ 7, Docket No. 14.

[6] Exclusive Sales and License Agreement at 1, Appendix 1, First Amended Complaint, Docket No. 14.

[7] Id. at 1, ¶ 1.

[8] Id. at 1-2, ¶ 2.

> [i]f during any year under this Agreement Rust-Oleum fails to purchase at least $500,000 of Products, Polar may convert this Agreement to a non-exclusive agreement for sales to the Market. In order to maintain the exclusive right to purchase the Products for sale into the Market, Rust-Oleum shall have the option of supplementing its payments to Polar for Product purchases so as to equal $500,000 for that year.[9]

The term of the Agreement was

> from January 1, 2016 through midnight on December 31, 2020, unless it is sooner terminated according to the provisions hereof. Notwithstanding the foregoing, either party may terminate this Agreement upon written notice to the other party in the event that Rust-Oleum fails to make the minimum annual purchases of the Products. . . .[10]

The Agreement provided that, in addition to paying for the products themselves, "Rust-Oleum [would] pay Polar royalties of 3% of its net sales of the Products" and that "[r]oyalties shall be paid quarterly within 30 days after the end of each calendar month during the term of this Agreement."[11]

The Agreement also provided that "upon termination of the agreement," plaintiff had the right "to procure from Rust-Oleum information on all sales of Products during the twelve (12) months prior to termination, including but not limited to customer contact information,

---

[9] Id. at 2, ¶ 2.

[10] Id. at 3, ¶ 9.

[11] Id. at 3, ¶ 8.

-3-

sales pricing, and sales volume."[12] Defendant also "agree[d] to contact and refer all customers having purchased Product within the twelve (12) months leading up to the termination of the agreement, to Polar's office for future sales."[13]

Plaintiff alleges that "[d]uring the first year of the Agreement, . . . Rust-Oleum purchased approximately $562,000 of product," but that "[b]y the end of the second year of the Agreement," which ran through January 31, 2018, Rust-Oleum had only purchased $268,869 of product.[14] Plaintiff alleges that it first "voiced its concerns to Rust-Oleum regarding Rust-Oleum's failure to meet the $500,000 threshold to maintain exclusivity" on January 29, 2018.[15] Plaintiff alleges that it also "raised the issue of non-payment of royalties" at that time.[16] Plaintiff alleges that at that time, Rust-Oleum "represented that it was selling Polar's product '[to] every major industrial distributor, such as Grainger, Fastenal, MSC, Applied Industrial, HD Supply WhiteCap, Fergusson, Valen, and many other middle and small distributors.'"[17]

---

[12] Id. at 3, ¶ 9.

[13] Id.

[14] First Amended Complaint at 3, ¶¶ 14-15, Docket No. 14.

[15] Id. at 5, ¶ 23.

[16] Id.

[17] Id. at 5, ¶ 25.

-4-

Case 4:20-cv-00017-HRH   Document 24   Filed 09/29/20   Page 4 of 16

Plaintiff alleges that defendant "represented that it wanted to make a new Polar GripAll product" and that "Polar expended resources to make the product and sent samples, but received no feedback from Rust-Oleum."[18] Plaintiff alleges that defendant "did not provide any test results, artwork, or even a potential name for the product."[19] Plaintiff alleges that although it "did create the new GripAll product requested by Rust-Oleum[, b]y August 2, 2018, Rust-Oleum had yet to market any of the new product. . . ."[20]

Plaintiff also alleges that "[t]hroughout the second and third years of the Agreement, Rust-Oleum made representations that it was entering into an agreement with Home Depot to sell the products, which required Polar to expend significant resources to accommodate the anticipated higher volume of production."[21] Plaintiff alleges that "[o]n or about November 8, 2016, Rust-Oleum represented to Polar that it would order 1,200 units of product without metal studs for an initial store test with The Home Depot."[22] Plaintiff alleges that "[o]n or about October 9, 2017, Rust-Oleum represented to Polar that '[t]he product is a go for a store test with Home Depot and the initial plan is to produce 100 cases of each

---

[18] Id. at 4, ¶ 18.

[19] Id.

[20] Id. at 5, ¶¶ 27-28.

[21] Id. at 3, ¶ 16.

[22] Id. at 4, ¶ 17.

item.'"²³ Plaintiff alleges that "[i]n order to meet" this increased sales demand, it "obtained a line of credit on [its] building to expand [its] factory."²⁴

Plaintiff alleges that "[o]n or about August 23, 2018, [it] terminated the exclusivity Agreement" because defendant had not purchased at least $500,000 of product during the second year of the Agreement.²⁵ Plaintiff also alleges that it requested that defendant "forward information on all sales of products during the twelve months prior to the termination of this contract including but not limited to customer contact information, sales pricing and sales volume."²⁶ Plaintiff alleges that it also asked defendant to "'contact and refer all customers having purchased product within the 12 months leading up to the termination of the agreement, to Polar's office for future sales.'"²⁷

Plaintiff alleges that defendant did not provide it "with the requested customer and sales information upon termination of the contract."²⁸ Plaintiff alleges that "[o]n or about March 28, 2019, seven months after the termination of the contract, Rust-Oleum provided

---

²³Id. at 4, ¶ 21.

²⁴Id. at 4, ¶ 20.

²⁵Id. at 5-6, ¶ 29.

²⁶Id. at 6, ¶ 30.

²⁷Id.

²⁸Id. at 6, ¶ 31.

a list of customers and sales information" for the period of "October 1, 2017 through October 12, 2018."[29]

On May 5, 2020, plaintiff commenced this action. Plaintiff's first amended complaint contains three counts. In Count I, plaintiff asserts breach of contract claims. In Count II, plaintiff asserts breach of the implied covenant of good faith and fair dealing claims. In Count III, plaintiff asserts negligent misrepresentation claims.

Pursuant to Rule 12(b)(6), Federal Rules of Civil Procedure, defendant now moves to dismiss all of plaintiff's claims.

## Discussion

"'To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Zixiang Li v. Kerry, 710 F.3d 995, 999 (9th Cir. 2013) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Id. (quoting Iqbal, 556 U.S. at 678). "The plausibility standard requires more than the sheer possibility or conceivability that a defendant has acted unlawfully." Id. "'Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.'" Id. (quoting Iqbal, 556 U.S. at 678). "[T]he complaint must provide

---

[29] Id. at 6, ¶ 32.

'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" In re Rigel Pharmaceuticals, Inc. Securities Litig., 697 F.3d 869, 875 (9th Cir. 2012) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "In evaluating a Rule 12(b)(6) motion, the court accepts the complaint's well-pleaded factual allegations as true and draws all reasonable inferences in the light most favorable to the plaintiff." Adams v. U.S. Forest Srvc., 671 F.3d 1138, 1142-43 (9th Cir. 2012). "However, the trial court does not have to accept as true conclusory allegations in a complaint or legal claims asserted in the form of factual allegations." In re Tracht Gut, LLC, 836 F.3d 1146, 1150 (9th Cir. 2016).

Defendant first moves to dismiss plaintiff's breach of contract claims in Count I. "In order to assert a claim for breach of contract, a plaintiff must generally allege: (1) existence of a contract; (2) breach; (3) causation; and (4) damages." Nicdao v. Chase Home Finance, 839 F. Supp. 2d 1051, 1068 (D. Alaska 2012). Defendant argues that plaintiff's breach of contract claims are not plausible because there have been no breaches of the contract.

Plaintiff first alleges that "[d]efendant breached" the Agreement by failing "to account for and pay royalties[.]"[30] More specifically, plaintiff alleges that defendant "failed to provide the accountings of the quarterly royalty earnings and failed to make the required quarterly payments as required by the Agreement."[31] Defendant argues that this claim is not

---

[30]First Amended Complaint at 7, ¶ 38, Docket No. 14.

[31]Id. at 5, ¶ 24.

-8-

plausible because it has paid all royalties due and because plaintiff had no right to audit its sales. Defendant contends that plaintiff has not alleged any factual support for its allegation that defendant did not pay royalties such as which payments might have been missed or when it might have raised this issue with defendant. Defendant also contends that it prepaid plaintiff $116,000 in royalties, but there is no evidence to support this contention.[32]

Plaintiff's breach of contract claim as it pertains to the payment of royalties is plausible. Plaintiff is not asserting that it had a right to audit defendant's sales. Rather, plaintiff is alleging that it is entitled to some sort of accounting of defendant's sales so that it can determine exactly what royalties were due. That plaintiff would be entitled to such an accounting is plausible under the terms of the Agreement. As for defendant's contention that plaintiff has not alleged any factual support for this claim, plaintiff has alleged that defendant did not "make any quarterly royalty payments[.]"[33] For purposes of a Rule 12(b)(6) motion, this is sufficient to establish that plaintiff has a plausible failure to pay royalties breach of contract claim.

Plaintiff also alleges that "[d]efendant breached" the Agreement by failing to "release sales information, release . . . customer information, and . . . refer customers back to Polar

---

[32]There is some sales information in Exhibit B to defendant's motion. The court has not considered this evidence because doing so would require the court to convert the instant motion into a motion for summary judgment.

[33]First Amended Complaint at 6, ¶ 29, Docket No. 14 (emphasis added).

upon termination of the Agreement."[34] Defendant argues that this claim is not plausible because the facts as pled in the first amended complaint show that it provided the sales and customer information after termination. Defendant points out that plaintiff has expressly alleged that defendant provided the sales information and a customer list on March 28, 2019.[35] Thus, defendant argues that there was no breach of the Agreement's provision regarding the sales and customer information. Defendant acknowledges that plaintiff is alleging that this information was provided in an untimely manner, given that it was allegedly provided seven months after termination of the Agreement. But, defendant argues that the Agreement did not contain a time frame in which the sales and customer information had to be provided nor did the Agreement suggest that timing was material. Defendant argues that plaintiff is asking the court to insert a "time is of the essence" provision into the Agreement, which the court cannot do. See State Farm Fire and Casualty Co. v. Somers and Associates, Inc., Case No. 3:08-cv-00047 TMB, 2009 WL 10674449, at *4 (D. Alaska Feb. 10, 2009) ("Where the terms" of a contract "are clear and unambiguous, . . . the [c]ourt will not rewrite them"). Defendant also suggests that plaintiff should not be heard to argue that time was of the essence, given that plaintiff waited more than six months after defendant did not meet the $500,000 requirement to terminate the Agreement. Defendant argues that the only reasonable interpretation of the Agreement is that the parties did not include a provision

---

[34]Id. at 7, ¶ 38.

[35]Id. at 6, ¶ 32.

-10-

requiring the immediate delivery of sales and customer information because this was not a material term and they recognized that defendant would need some time to collect this information.

Plaintiff's breach of contract claim as to the sales and customer information is plausible. If, as defendant contends, the Agreement was silent as to when this information should be provided, then "'a reasonable time is implied.'" Laybourn v. City of Wasilla, 362 P.3d 447, 459 (Alaska 2015) (quoting Hall v. Add–Ventures, Ltd., 695 P.2d 1081, 1089 (Alaska 1985)). Plaintiff has alleged that defendant did not provide the sales and customer information until seven months after the termination of the Agreement. It is plausible that this could be viewed as an unreasonable amount of time in which to produce this information, given that the Agreement provided that this information should be produced "upon termination. . . ."[36]

Defendant next moves to dismiss plaintiff's breach of the implied covenant of good faith and fair dealing claims in Count II. "The covenant of good faith and fair dealing is implied in every contract in order to effectuate the reasonable expectations of the parties to the agreement[.]" Ramsey v. City of Sand Point, 936 P.2d 126, 133 (Alaska 1997). "A party must act in subjective good faith, meaning that it cannot act to deprive the other party of the explicit benefits of the contract, and in objective good faith, which consists of acting in a

---

[36]Exclusive Sales and License Agreement at 3, ¶ 9, Appendix 1, First Amended Complaint, Docket No. 14.

-11-

manner that a reasonable person would regard as fair." Casey v. Semco Energy, Inc., 92 P.3d 379, 384 (Alaska 2004). "[T]he purpose of the covenant is to effectuate the reasonable expectations of the parties, not add to them and 'cannot be interpreted to prohibit what is expressly permitted.'" Id. at 384–85 (quoting Ramsey, 936 P.2d at 133).

Plaintiff alleges that defendant breached the implied covenant because defendant did not timely provide the sales and customer information and did not make any royalty payments.[37] These breach of the implied covenant claims are plausible because, as discussed above, plaintiff's breach of contract claims based on the same allegations are plausible.

Plaintiff also alleges that defendant breached the implied covenant "by requiring [p]laintiff to expend significant resources to meet expected demand representations, then failing to fulfill those expected demands."[38] Plaintiff alleges that it "relied on [d]efendant's representations relating to The Home Depot and [d]efendant's intent to create a new GripAll product" and that "[d]efendant's representations regarding the potential contract and new product were not made in good faith as evidenced by the complete absence of any sales reported to The Home Depot."[39] Defendant argues that this breach of the implied covenant claim is not plausible because the Agreement expressly stated that the parties' expectations

---

[37]First Amended Complaint at 8, ¶¶ 43-45, Docket No. 14.

[38]Id. at 8, ¶ 42.

[39]Id. at 8, ¶¶ 46-47.

-12-

included "explor[ing] the value of the Product in the Market. . . ."[40] Defendant argues that this recital shows that the parties knew that market demand was uncertain and that any decision by plaintiff to expend significant resources was solely plaintiff's and not something defendant required of plaintiff. Defendant also points out that the Agreement required plaintiff to "use its best efforts to fill any orders for Products placed by Rust-Oleum as quickly as possible" and that it would "meet the Products purchase requirements of Rust-Oleum."[41] Defendant argues that these express provisions in the Agreement show that any significant expenditures by plaintiff were made in order for plaintiff to fulfill its obligations under the Agreement. Defendant also argues that any allegation that it acted unfairly is not plausible in light of plaintiff's allegation that defendant was selling plaintiff's "product '[to] every major industrial distributor, such as Grainger, Fastenal, MSC, Applied Industrial, HD Supply WhiteCap, Fergusson, Valen, and many other middle and small distributors.'"[42] Defendant also argues that there was nothing unfair or dishonest about its representations to plaintiff about The Home Depot opportunity. Defendant contends that it was simply keeping plaintiff informed about this opportunity, which, unfortunately did not pan out because defendant could not convert The Home Depot into a customer.

---

[40]Exclusive Sales and License Agreement at 1, Appendix 1, First Amended Complaint, Docket No. 14.

[41]Id. at 2, ¶¶ 3, 6.

[42]First Amended Complaint at 5, ¶ 25, Docket No. 14.

-13-

Plaintiff's breach of the implied covenant claim based on the Home Depot opportunity is plausible. Plaintiff has adequately alleged that defendant failed to act with subjective and objective good faith. Plaintiff has alleged defendant acted to deprive plaintiff of the benefits of the Agreement when it demanded that plaintiff make a new product but then failed to provide any information to plaintiff about how this new product was being marketed once it was created. And plaintiff has alleged that defendant's behavior regarding The Home Depot opportunity was unfair given that defendant required plaintiff to expend significant resources on product creation but then did little to actually market this product.

Finally, defendant moves to dismiss plaintiff's negligent misrepresentation claims in Count III. To state a claim for negligent misrepresentation, a plaintiff must allege that

> "(1) the party accused of misrepresentation . . . made the statement in the course of his business, profession or employment; (2) the representation . . . suppl[ied] false information; (3) the plaintiff [justifiably relied] on the false information; and (4) the accused party . . . failed to exercise reasonable care or competence in obtaining or communicating the information."

Miller v. State, Dep't of Environmental Conservation, 353 P.3d 346, 348 (Alaska 2015) (quoting Willard v. Khotol Servs. Corp., 171 P.3d 108, 118–19 (Alaska 2007)). Plaintiff alleges that defendant "negligently misrepresented its intent to maintain an exclusive purchase and sales contract with [p]laintiff for the duration of the contract term[,]" "its intent to meet the agreed-upon purchase threshold to maintain exclusivity[,]" and "its intent to enter

into third-party agreements for the sale and distribution of [p]laintiff's products."[43] Plaintiff alleges that it "reasonably relied on [d]efendant's misrepresentations when deciding to enter into the exclusivity agreement and to expend considerable sums of money to expand its factory and production capacity."[44]

Plaintiff's negligent misrepresentation claims fail because they are based on the parties' contract, and claims involving contractual commitments "'sound in contract, rather than tort.'" K & K Recycling, Inc. v. Alaska Gold Co., 80 P.3d 702, 717 (Alaska 2003) (quoting Kalenka v. Taylor, 896 P.2d 222, 228 (Alaska 1995)). "Generally, 'where contractual remedies exist, courts should hesitate to graft additional remedies in the absence of some good reason.'" Nicdao, 839 F. Supp. 2d at 1072 (quoting St. Denis v. Dep't of Hous. & Urban Dev., 900 F. Supp. 1194, 1206 (D. Alaska 1995)). "Accordingly, '[t]he economic loss doctrine provides that certain economic losses are properly remediable only in contract.'" Id. (quoting Giles v. Gen. Motors Acceptance Corp., 494 F.3d 865, 873 (9th Cir. 2007)). "This doctrine is most typically applied in product liability cases, as well as negligence and strict liability cases." Id. "Some courts have found, however, that even where the parties have a contractual relationship, the doctrine does not bar claims based on behavior occurring outside of that relationship." Id. However, here, plaintiff's negligent misrepresentation claims are not based on behavior that occurred outside of the parties'

---

[43]Id. at 9, ¶¶ 50-52.

[44]Id. at 9, ¶ 53.

-15-

contractual relationship. Rather, plaintiff's negligent misrepresentation claims are all based on conduct that occurred in connection with the parties' contractual relationship. Thus, plaintiff's misrepresentation claims are barred by the economic loss doctrine, and these claims are dismissed. Plaintiff is not given leave to amend its negligent misrepresentation claims as amendment would be futile.

## Conclusion

Defendant's motion to dismiss[45] is granted in part and denied in part. Plaintiff's negligent misrepresentation claims in Count III are dismissed without leave to amend. The motion is otherwise denied.

DATED at Anchorage, Alaska, this 29th day of September, 2020.

/s/ H. Russel Holland
United States District Judge

---

[45] Docket No. 18.