**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| POLAR ENVIRONMENTAL TECHNOLOGIES, INC.,<br><br>　　　　Plaintiff,<br><br>　vs.<br><br>RUST-OLEUM CORPORATION,<br><br>　　　　Defendant.<br><br>―――――――――――――――<br><br>RUST-OLEUM CORPORATION,<br><br>　　　　Counter-Plaintiff,<br><br>　vs.<br><br>POLAR ENVIRONMENTAL TECHNOLOGIES, INC., and GRIPALL GLOBAL, LLC,<br><br>　　　　Counter-Defendants. | No. 4:20-cv-00017-HRH |

O R D E R

Motion for Summary Judgment

Defendant Rust-Oleum Corporation moves for summary judgment on plaintiff Polar

Environmental Technologies' breach of contract and breach of the covenant of good faith

and fair dealing claims.[1]  The motion is opposed.[2]  Oral argument was not requested and is not deemed necessary.

<u>Facts</u>

Plaintiff Polar Environmental Technologies, Inc. ("Polar") is an Alaska corporation that manufactured and sold slip-resistant flooring strips.  In February 2016, Polar signed an exclusive distribution and sales contract with the defendant, Rust-Oleum Corporation. The contract's term was from January 1, 2016, to December 31, 2020.[3]  During the contract's term, Polar agreed not to sell its products for consumer retail or industrial use outside of Alaska to anyone other than Rust-Oleum.

**1.  Grant of Exclusive Right to Purchase.**  Polar hereby agrees that during the term of this Agreement, except as specifically provided herein, it will not sell or otherwise distribute the Products to any other persons or entities, other than Rust-Oleum, for sale in the consumer retail and industrial distribution channels and entertainment industry direct e.g. venue projects such as, stadiums, arenas, and amusement parks (the "Market").  The Market excludes the state of Alaska.  Polar shall retain the sole right to sell the Products and all other Polar Products in Alaska and to other purchasers and third parties in the Sports market during the term of this Agreement, provided that such purchasers are not actually known by Polar to be engaged in sales in the Market.  The sport market ("Sports") is defined as consumer retail and industrial distribution channels for OEM and aftermarket sports equipment. In granting Rust-Oleum the exclusivity described in this Agreement, Polar represents only that it will not knowingly make any sales of the Products to customers other than Rust-Oleum for resale in the Market.  Polar does not and cannot make any representations or warranties concerning the end use of the Products.  Polar will use commercially reasonable efforts to track the end uses of the Products by its customers and will discontinue immediately any

---

[1] Docket No. 67.

[2] Docket No. 81 (Opposition); Docket No. 83 (Reply).

[3] Docket No. 79-4 at 3, ¶ 9.

2

sales of the Products to any customer if Polar learns, or has reason to believe, that such customer is or has the intention of using the Products in the Market.[4]

In exchange, Rust-Oleum agreed to buy at least $500,000 of Polar's products annually. The contract provided that if Rust-Oleum ever bought less than $500,000 of Polar's products in a single year, Polar had the right to convert the parties' agreement from exclusive to non-exclusive. In such situations, the contract gave Rust-Oleum the option to preserve exclusivity by making supplemental payments to Polar to bring its annual payment total up to the $500,000 minimum.

> **2. Consideration for Grant of Exclusive Right.** As consideration for the grant of the limited exclusive right to purchase described in Section 1, above, Rust-Oleum agrees to purchase from Polar not less than FIVE HUNDRED THOUSAND DOLLARS ($500,000.00) of Products each year during the term of this agreement. If during any year under this Agreement Rust-Oleum fails to purchase at least $500,000 of Products, Polar may convert this Agreement to a non-exclusive agreement for sales to the Market. In order to maintain the exclusive right to purchase the Products for sale into the Market, Rust-Oleum shall have the option of supplementing its payments to Polar for Products purchases so as to equal $500,000 for that year.[5]

The contract also provided that Rust-Oleum would pay Polar a 3 percent royalty on its net sales of Polar's products.

> **8. License Royalties.** Rust-Oleum will pay Polar royalties of 3% on its net sales of the Products. "Net Sales" shall be Rust-Oleum's gross sales price of the Products, minus any transportation costs and returns. Royalties shall be paid quarterly within 30 days after the end of each calendar month during the term of this Agreement.[6]

---

[4] Docket No. 79-4 at 1, ¶ 1.

[5] Docket No. 79-4 at 1–2, ¶ 2.

[6] Docket No. 79-4 at 3, ¶ 8.

3

The contract also provided that if Rust-Oleum failed to make its minimum annual purchases, either party could terminate the contract in its entirety.[7] In that event, the contract gave Polar the right to "procure from Rust-Oleum information on all sales of [Polar's] Products during the twelve (12) months prior to termination, including but not limited to customer contact information, sales pricing, and sales volume."[8] It also required Rust-Oleum to "contact and refer all customers having purchased [Polar] Product within the twelve (12) months leading up to the termination of the agreement[] to Polar's office for future sales."[9]

> **9. Term; Termination.** . . . [E]ither party may terminate this Agreement upon written notice to the other party in the event that Rust-Oleum fails to make the minimum annual purchases of the Products as described in Section 2 of this Agreement. . . . Polar reserve[s] the right, upon termination of the agreement, to procure from Rust-Oleum information on all sales of Products during the twelve (12) months prior to termination, including but not limited to customer contact information, sales pricing, and sales volume. Rust-Oleum agrees to contact and refer all customers having purchased Product within the twelve (12) months leading up to the termination of the agreement, to Polar's office for future sales.[[10]]

The evidence indicates that the parties' collaboration did not go smoothly. Polar's first delivery to Rust-Oleum was behind schedule and over-budget.[11] Polar appears to have struggled to fill Rust-Oleum's large product orders. According to its witnesses, Rust-

---

[7] Docket No. 79-4 at 3, ¶ 9.

[8] Id.

[9] Id.

[10] Id.

[11] Docket No. 80-2 at 1–4.

4

Oleum took measures to try to help Polar. Kelly Bye, a vice president in Rust-Oleum's industrial division, testified at his deposition that Rust-Oleum went "above and beyond" to help Polar by "prepa[ying] some purchases at a time before we actually got goods or even received the goods," "paying for intermediates," using their own business people to try to "find other raw material sources for [Polar] at a cheaper rate," and sending "[their] inventory people out to see if we could evaluate the inventory process if there's any benefits or – or anything we [could] improve upon their manufacturing to help them."[12] Rebecca Woodward Varner, a Rust-Oleum sourcing manager, testified at her deposition that Rust-Oleum prepaid royalties, prepaid the first year's orders, reimbursed Polar for tooling costs, and allowed Polar to retain the tools and tooling blueprints.[13]

Additionally, Bye testified that Rust-Oleum's industrial division had its consumer division try to persuade The Home Depot to begin carrying Polar's products, although Rust-Oleum's consumer division felt that Polar's products were too expensive to put in Home Depot.[14] Rust-Oleum eventually secured a store test with Home Depot. In an October 2017 email, Varner explained to Trevor Miles, Polar's chief operating officer, that "potentially, the opportunity is huge, but it could also be a bust. We have no real way of knowing the success until after the store test."[15] At their depositions, both Miles and his

[12] Docket No. 79-1 at 20, lns. 11–20.

[13] Docket No. 79-8 at 10–13.

[14] Docket No. 79-1 at 8–9.

[15] Docket No. 79-11.

wife, DeAnna Miles, who served as Polar's president and CEO, admitted that the Home Depot possibility was neither part of the contract nor guaranteed by Rust-Oleum.[16] Although the evidence does not explicitly say what happened, Home Depot apparently decided not to carry Polar's products.[17]

In January 2018, Trevor Miles emailed Bye that Rust-Oleum was more than $200,000 short of its $500,000 minimum purchase amount for 2017.[18] In response, Bye explained that, in his opinion, the slow sales of Polar's products were due to the products' "premium price" in a consumer market that preferred "cost effective" options.[19]

> Both sides of the business are embattled with price being the issue. Consumer has chosen a more cost effective option to be at lower retail. On the industrial side, we are attempting to prove to end-users that this is worth the premium price and so far that has been a slow path. We have the product in every major industrial distributor, such as Grainger, Fastenal, MSC, Applied Industrial, HD Supply WhiteCap, Fergusson, Valen and many other middle and smaller distributors. I believe we will get there but the out the door sales have been much slower than we first expected.[20]

On August 23, 2018, Polar terminated the parties' contract.[21] On September 6,

---

[16] Docket No. 79-2 at 43 (DeAnna); Docket No. 79-3 at 44 (Trevor).

[17] See Docket No. 79-1 at 8, lns. 16–17 ("I don't believe there was ever a sale to Home Depot . . . .").

[18] Docket No. 80-3 at 3.

[19] Id. at 2.

[20] Id.

[21] See Docket No. 79-2 at 41; Docket No. 79-3 at 45. It is not clear whether Polar initially terminated the entire contract or merely terminated the exclusivity provision. In her deposition, DeAnna Miles characterized the termination to have only ended the exclusivity arrangement. See Docket No. 79-2 at 41 ("Q: And as a result of [Rust-Oleum not making their payment], then you terminated the exclusivity for year three of the agreement? A: Yeah. It looks like [our August 23 email to Rust-Oleum said] we wouldn't be able to

6

2018, Polar requested Rust-Oleum's information on its sales of Polar's products, per the contract's termination provision.[22] Rust-Oleum provided the requested information on November 21, 2018.[23] But the information Rust-Oleum provided only began from October 1, 2017.[24]

### Procedural History

On May 5, 2020, Polar sued Rust-Oleum in this court.[25] Polar's amended complaint alleged three claims against Rust-Oleum: 1) breach of contract; 2) breach of the implied covenant of good faith and fair dealing; and 3) negligent misrepresentation.[26] Rust-Oleum's answer denied Polar's claims and raised the usual litany of affirmative defenses.[27]

In its answer, Rust-Oleum also alleged four counterclaims against Polar: 1) breach of contract; 2) breach of the implied covenant of good faith and fair dealing; 3) unjust enrichment; and 4) conversion.[28] Rust-Oleum later amended its answer to include claims

---

continue to offer exclusivity."). But Trevor Miles seemed to think that Polar terminated the entire contract. See, e.g., Docket No. 79-3 at 45 (describing Polar's Aug. 23 email to Rust-Oleum to have "ended the contract"). Under the terms of the contract, Polar was only entitled to Rust-Oleum's sales information upon termination of the entire contract, not termination of the exclusivity agreement. See Docket No. 79-4 at 1–2, ¶ 2, and 3, ¶ 9. Given the end result, the court concludes that Polar de facto terminated the entire contract.

[22] See Docket No. 79-2 at 41.

[23] Id. at 41–42. A copy of the information is contained in Docket No. 80-4.

[24] Docket No. 79-2 at 42.

[25] Docket No. 1 (Compl.); Docket No. 14 (Amend. Compl., filed Aug. 9, 2020).

[26] Docket No. 14 at 7–9, ¶¶ 36–54.

[27] Docket No. 27 at 11–17 (Amend. Ans.).

[28] Docket No. 27 at 18–24.

7

against Trevor and DeAnna Miles' new company, GripAll Global, LLC.[29]  Polar and GripAll denied Rust-Oleum's counterclaims and responded with their own host of affirmative defenses.[30]

On July 27, 2020, Rust-Oleum moved to dismiss Polar's claims for failure to state a claim upon which relief could be granted.[31]  The court granted the motion in part, dismissing Polar's negligent misrepresentation claim (Claim 3).[32]  But the court denied the motion with respect to Polar's breach of contract and breach of the implied covenant of good faith and fair dealing claims (Claims 1 and 2).[33]

## Legal Standard

Parties may move for summary judgment on their claims and defenses or any parts thereof.  Fed. R. Civ. P. 56(a).  The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Id.  "An issue of fact is 'material' if it 'might affect the outcome of the suit under the governing law.'  A dispute is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'"  S. Cal. Darts Ass'n v. Zaffina, 762 F.3d 921, 925 (9th Cir. 2014) (citations omitted) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  Parties may offer evidence to support or oppose facts at

---

[29] Docket No. 57 (Counterclaim Compl.).

[30] Docket No. 63 at 7–13 (Counterclaim Ans.).

[31] Docket No. 18.

[32] Docket No. 24.

[33] Id.

summary judgment only if the evidence "could be presented in an admissible form at trial." Id. at 925-26 (quoting Fraser v. Goodale, 342 F.3d 1032, 1036-37 (9th Cir. 2003)).

When a party that does not have the ultimate burden of proof at trial moves for summary judgment, it "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden at trial." Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000). If it fails, "the nonmoving party has no obligation to produce anything" and "may defeat the motion for summary judgment without producing anything." Id. at 1102-03. But if the moving party succeeds, the nonmoving party must then "set forth specific facts" showing a genuine issue of material fact regarding its claim or defense. Leisek v. Brightwood Corp., 278 F.3d 895, 898 (9th Cir. 2002) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986)). If the nonmoving party sets forth such facts, it defeats the motion for summary judgment; if it does not, the moving party wins the motion. Nissan Fire, 210 F.3d at 1103.

Discussion

Rust-Oleum moves for summary judgment on Polar's two remaining claims: breach of contract (Claim 1) and breach of the implied covenant of good faith and fair dealing (Claim 2).

A. Whether Rust-Oleum Is Entitled to Summary Judgment on Polar's Breach of Contract Claim (Claim 1)

In Claim 1, Polar alleges that Rust-Oleum breached the parties' contract by 1) failing to "account and pay for royalties"; and 2) failing to provide Polar with sales

9

information and to refer customers to Polar after the contract's termination.[34]  Rust-Oleum asserts that it is entitled to summary judgment on Claim 1 because 1) it paid all required royalties and 2) it provided the required sales information and referred past customers to Polar.

### a. Whether Rust-Oleum Failed to Pay Royalties to Polar

Rust-Oleum first asserts there is no genuine dispute that it paid Polar all required royalties.  Rust-Oleum asserts that it paid Polar at least $28,000 in royalties during the parties' arrangement, and it points out that Trevor Miles conceded this fact at his deposition.[35]  Rust-Oleum offers the deposition testimony of its accounting expert, Melissa Bennis, who concluded that Rust-Oleum did not underpay royalties to Polar.  To the contrary, Bennis testified that Rust-Oleum may have overpaid its royalties to Polar by either $9,204.32 or $11,797.32, depending on the accounting assumptions used.[36]  Rust-Oleum also points out that Polar's financial expert, Dr. Charles Sparks, testified in his deposition that he had not "formulated an opinion . . . with a reasonable degree of financial certainty [regarding] the amount of royalties that [he] believe[d] were owed to Polar during the relationship."[37]

_____

[34] Docket No. 14 at 7, ¶¶ 36–39.

[35] Docket No. 67 at 14–15 (citing Docket No. 79-3 at 36).

[36] Docket No. 79-5 at 5–7.

[37] Docket No. 67 at 15 (citing Docket No. 79-16 at 6).

In opposition, Polar maintains that a genuine dispute of material fact exists regarding whether Rust-Oleum paid Polar the required royalties. Polar points to the deposition testimony of DeAnna Miles, who initially stated that Rust-Oleum did not pay royalties. DeAnna later admitted that Rust-Oleum paid Polar $28,000 in royalties, but she stated that Rust-Oleum later offset those royalties and deducted an equal amount from subsequent payments to Polar.[38] Polar offers DeAnna's deposition testimony that Polar asked for quarterly royalty accountings "many, many, many times," but Rust-Oleum never provided any.[39] Regarding Rust-Oleum's accounting expert's conclusion that Rust-Oleum overpaid royalties, Polar asserts that "missing data and Rust-Oleum's poor recordkeeping" make it difficult to establish what the royalties figure actually was.[40] Polar asserts that this demonstrates a genuine dispute of material fact as to whether Rust-Oleum fulfilled its contractual obligations to pay royalties.

In reply, Rust-Oleum reiterates that Polar has conceded that it paid $28,000 in royalties, and it points out that Polar "has failed to offer any admissible evidence to suggest the undisputed $28,000 paid to Polar was insufficient."[41] It also notes that at Trevor

---

[38] See Docket No. 81-4 at 5 ("[T]hey took the royalties out of [a payment]"); Docket 81-1 at 8 ("Q: Were you aware that Rust-Oleum prepaid $28,000 in royalties?" "A: They took it back, though, out of invoices.") In DeAnna's deposition, the questioner then asked, "And then they paid it back in again. Were you aware of that?" However, the exhibit cuts off DeAnna's response. See id. at 8–9.

[39] Docket No. 81-1 at 7.

[40] Docket No. 81 at 9.

[41] Docket No. 83 at 2–3.

Miles's deposition, he admitted that although Rust-Oleum deducted the royalty prepayment, it "was brought back again later on."[42]  Polar's reply memorandum includes an exhibit containing a copy of an accounting spreadsheet it used to calculate royalties.[43]  Rust-Oleum asserts that the spreadsheet was given a Bates number and disclosed to Polar and Dr. Sparks.[44]  The spreadsheet contains a list of Rust-Oleum's sales of Polar's products.  The spreadsheet shows that Rust-Oleum's net sales of these products totaled $915,029, and it shows that the associated 3 percent royalty figure was $27,451.[45]  Rust-Oleum asserts that Dr. Sparks' expert report is both inadmissible and contains no evidence that it underpaid royalties, and it concludes that summary judgment in its favor is warranted.

To prevail on a breach of contract claim under Alaska law,[46] a plaintiff "must show that the defendant had a duty to perform and that the defendant failed to perform as agreed in the contract." Guy v. Providence Health & Servs. Wash., 502 P.3d 13, 22 (Alaska 2022) (quoting Alaska Pattern Jury Instructions – Civ. 24.03 Cmt.).  A plaintiff must also show that they suffered damages.  See Great W. Sav. Bank v. George W. Easley Co., 778 P.2d

---

[42] Docket No. 79-3 at 35.

[43] Docket No. 83-1.  Rust-Oleum also provided a conventional copy of the spreadsheet. Docket No. 84.

[44] Docket No. 83 at 3 & n.1.

[45] Id. at 4.

[46] The contract contains a choice-of-law clause providing that the contract shall be interpreted under Alaska law.  Docket No. 79-4 at 5, ¶ 20.  Neither party has contested this clause's applicability.  Accordingly, the court will apply Alaska state law to the plaintiff's claims.

569, 577-78 (Alaska 1989) (holding that alleging a contractual obligation, a breach of that obligation, and a suffering of damages is sufficient under Alaska's notice-pleading standard to state a claim for breach of contract and survive a motion to dismiss). Whether a breach of contract has occurred is a question of fact. Laybourn v. City of Wasilla, 362 P.3d 447, 452 (Alaska 2015).

The court concludes that Rust-Oleum is entitled to summary judgment on the failure-to-pay-royalties portion of Claim 1. As an initial proposition, Polar has conceded that Rust-Oleum paid the royalties which were due to Polar. Polar has argued that Rust-Oleum later deducted those royalties from subsequent payments; but, as Trevor Miles testified, the deducted payments were eventually "brought back again later on."[47] Polar's expert, Dr. Sparks, was unable to testify that any outstanding royalties existed.

Polar's response — that Dr. Sparks's failure to identify outstanding royalties was the result of Rust-Oleum's "missing data" and "poor recordkeeping" — is not credible. Dr. Sparks's report gives no explanation for his assertions about Rust-Oleum's "missing data" and "poor recordkeeping." His report merely asserts that "[r]etail sales data . . . necessary for the computation of royalties due under the contract . . . were never provided" and that Rust-Oleum's "only disclosures on royalties was [sic] incomprehensible."[48] But Rust-Oleum's disclosure regarding royalties was not incomplete or incomprehensible. The royalties spreadsheet that Rust-Oleum provided constitutes clear

---

[47] Docket No.79-3 at 35.

[48] Docket No. 81-6 at 13 & n.9.

evidence that Rust-Oleum made the required payments.[49]  The spreadsheet clearly details each sale of Polar's products and the amounts of each sale, calculates the sales totals, deducts freight costs, and produces a net sales figure from which it calculates the 3 percent royalty total of $27,451.[50]  The full spreadsheet, which Rust-Oleum filed conventionally, also contains a monthly accounting of its royalty prepayments to Polar.  In combination with the testimony of Rust-Oleum's expert, Melissa Bennis, that Rust-Oleum overpaid rather than underpaid Polar's royalties, this evidence negates Polar's claim that Rust-Oleum underpaid its royalties.

The question of whether or not Rust-Oleum paid three percent royalties to Polar is a material issue.  However, Polar has failed to establish the existence of a genuine dispute as regards payment of the three percent royalty.  Based upon what is before the court, no reasonable jury could find that Rust-Oleum had failed to pay Polar the agreed-upon three percent royalty on net sales.

        b. <u>Whether Rust-Oleum Failed to Provide Sales Information and Refer Customers to Polar</u>

Rust-Oleum asserts that it fulfilled its contractual obligations to provide sales information and refer past customers to Polar.  Rust-Oleum notes that Polar asked for its sales information on September 6, 2018, and that Rust-Oleum provided the information on

---

[49] Polar has not challenged the spreadsheet's authenticity.

[50] Docket No. 83-1 at 1–3.

November 21, 2018.[51]  Rust-Oleum asserts that "Polar provided no evidence that this was not a reasonable reply time and certainly [did] not [provide] any evidence that suggested damages occurred as a result."[52]

Regarding Rust-Oleum's obligation to provide sales information, Polar concedes that Rust-Oleum "eventually produced the information."  But Polar maintains that Rust-Oleum breached its obligation by taking nearly three months to produce the information.  Polar asserts that this gap "resulted in an inability [for Polar] to maintain a customer base."[53]

The legal standard for this aspect of Polar's breach-of-contract claim is identical to the standard recited in subsection (a).  Polar "must show that the defendant had a duty to perform and that the defendant failed to perform as agreed in the contract."  Guy, 502 P.3d at 22 (quoting Alaska Pattern Jury Instructions – Civ. 24.03 Cmt.).  Polar must also show that Rust-Oleum's failure to perform caused Polar to suffer damages.  See Great W. Sav. Bank, 778 P.2d at 577-78.

Rust-Oleum is entitled to summary judgment on Polar's sales information claim.  Polar has conceded that Rust-Oleum provided the requested sales information in November 2018.  Its opposition relies almost entirely on the nearly three-month "gap" that elapsed

---

[51] Polar's complaint alleged that Rust-Oleum did not provide the information until March 28, 2019.  Docket No. 14 at 6, ¶¶ 32–33.

[52] Docket No. 67 at 17.

[53] Docket No. 81 at 13–14.

before Rust-Oleum provided the information. But there is no evidence that this "gap" constituted a breach of the parties' contract. The contract did not specify any deadline or timeframe by which Rust-Oleum had to provide the information. The contract contained an integration clause,[54] and there is no indication that the parties had any "reasonable expectations" that might justify the Court supplying a specific timeframe to ensure fairness. See Renaissance Alaska, LLC v. Rutter & Wilbanks Corp., 263 P.3d 35, 40 (Alaska 2011) ("'A court may supply an essential term that has been omitted from an otherwise sufficiently defined contract.' . . . [C]ourts may fill a gap to 'ensure fairness where the reasonable expectations of the parties are clear.' . . . [T]he 'threshold inquiry in determining whether [a] case is an appropriate one for gap-filling is whether, in fact, there is an essential term or circumstance for which the parties failed to plan.'" (citations omitted) (fourth alteration in original) (quoting Casey v. Semco Energy, Inc., 92 P.3d 379, 386 (Alaska 2004)). The court holds that Rust-Oleum was required to provide the information within a "reasonable period." See Castle Props., Inc. v. Wasilla Lake Church of the Nazarene, 347 P.3d 990, 996 (Alaska 2015) ("[W]here a contract does not specify a time limit for performance, a 'reasonable period' may be implied."). The period is determined "upon consideration of the subject matter of the contract, what was contemplated at the time the contract was made, and other surrounding circumstances." Hall v. Add-Ventures, Ltd., 695 P.2d 1081, 1089 (Alaska 1985).

---

[54] Docket No. 79-4 at 5, ¶ 18.

Polar provided no evidence that three months was not a reasonable reply time with respect to providing the sales information. Polar's conclusory argument that Rust-Oleum's delayed delivery of that information for an entire business quarter is insufficient to establish a genuine fact dispute. Moreover, Polar has offered no evidence that the three-month "gap" caused it damages. The court concludes that Polar has not met its ultimate burden of establishing that Rust-Oleum failed to provide sales information in a reasonable period or that it (Polar) suffered any damage.

Rust-Oleum further asserts that it fulfilled its obligations to refer past customers to Polar. It offers Trevor Miles's deposition testimony, in which Miles admitted that some of Rust-Oleum's past customers told him that they had received referral letters from Rust-Oleum.[55] Rust-Oleum also notes that Miles said that he did not know of any past Rust-Oleum customers who never received a referral letter.[56]

Regarding Rust-Oleum's obligation to refer customers to Polar post-termination, Polar's opposition puts forward no arguments at all. It merely points to Trevor Miles's deposition testimony that sales of Polar's products started "picking back up" in 2019 and 2020.[57]

Polar has failed to produce any evidence that Rust-Oleum failed to refer past customers of Polar's products to Polar, nor has Polar produced any evidence of damages.

---

[55] Citing Docket No. 79-3 at 16.

[56] Citing Docket No. 79-3 at 19.

[57] Docket No. 81 at 13–14 (citing Docket No. 81-4 at 3).

17

Polar has failed to establish the existence of a genuine dispute of material fact with respect to Rust-Oleum's compliance with its obligation to refer past customers to Polar.

For these reasons, Rust-Oleum is entitled to summary judgment on plaintiff's breach of contract Claim 1.

B.  Whether Rust-Oleum Breached the Covenant of Good Faith and Fair Dealing (Claim 2)

Rust-Oleum first asserts that because it should prevail on Polar's breach-of-contract Claim 1 regarding royalties, referral of past customers, and sales information, it should also prevail on Polar's bad faith claims that involve the same allegations.[58]  Rust-Oleum secondly asserts that, as a matter of law, its dealings with The Home Depot cannot have constituted bad faith because it had no contractual obligation to sell or market Polar's products to Home Depot.[59]  Rust-Oleum further asserts that the facts negate any claim that it violated either the subjective or objective elements of the covenant of good faith.

In opposition, Polar concedes that if the Court "analyze[s] each separate issue in a vacuum," it "becomes clear that none of [Polar's] claims would withstand summary judgment."[60]  Instead, Polar maintains that "it was Rust-Oleum's behavior as a whole that caused Polar damages in this case, not any one issue."  Polar asserts that Rust-Oleum, knowing that Polar was struggling financially, "pressured" Polar to develop a new product

---

[58] Docket No. 67 at 20.

[59] Id. at 21–22.

[60] Docket No. 81 at 16.

for a test with Home Depot while simultaneously "failing to make purchases and fulfill orders on its end."[61]

Under Alaska law, all contracts contain an implied covenant of good faith and fair dealing as a matter of law. Alaska Pac. Assurance Co. v. Collins, 794 P.2d 936, 947 (Alaska 1990). This implied covenant has a subjective element and an objective element. Anchorage Chrysler Ctr., Inc. v. DaimlerChrysler Motors Corp., 221 P.3d 977, 992 (Alaska 2009). "A party asserting a breach of the covenant must prove that the other party failed to act in subjective good faith, 'meaning that it cannot act to deprive the other party of the explicit benefits of the contract,' or that it failed to act 'in objective good faith, which consists of acting in a manner that a reasonable person would regard as fair.'" Laybourn, 362 P.3d at 458 (quoting Casey, 92 P.3d at 384). Whether a breach of the implied covenant has occurred is a question of fact. Id. at 452.

As set out above, the court has concluded that Rust-Oleum did not breach any of its contractual obligations to Polar, nor did it cause Polar to suffer any damages. Nothing in the evidence the parties have provided suggests that Rust-Oleum acted in subjective bad faith to deprive Polar of its expected benefits. Rust-Oleum unquestionably knew that Polar was struggling financially. But the evidence shows that Rust-Oleum took extraordinary measures to try and help Polar financially. Such measures are substantial evidence of Rust-Oleum's good-faith effort to make its contract with Polar succeed.

---

[61] Id. at 14–15.

Polar's only counterargument — that "it was Rust-Oleum's behavior as a whole" that constituted bad faith — strains credulity. Polar's assertion that Rust-Oleum "pressured" it in bad faith to develop a new product for Home Depot while it was on the brink of insolvency is belied by the fact that, according to Trevor Miles's deposition, Polar was apparently developing the new product on its own accord before it began discussing a Home Depot store test.[62] Moreover, Rust-Oleum reimbursed Polar for the $18,000 it incurred in tooling costs for the new product, which Polar (or the third-party defendant, GripAll Global) is still using profitably.[63] In short, Rust-Oleum has demonstrated that Polar has insufficient evidence to prove that Rust-Oleum acted in subjective bad faith. No reasonable jury would find that the defendant acted in bad faith.

Polar has produced no evidence supporting a factual finding that Rust-Oleum's actions were objectively unreasonable. Rust-Oleum's witnesses have reasonable explanations for the company's actions in its dealings with Polar. Had Rust-Oleum made smaller orders, it might have smoothed out Polar's supply and labor costs and made the arrangement sustainable. But there is no evidence that defendant's placement of large orders was due to subjective or objective bad faith. The contract contained no terms obligating Rust-Oleum to make its orders at any set intervals or size.

In sum, the evidence establishes that Rust-Oleum did not act in bad faith toward Polar either subjectively or objectively. Polar has conceded that none of its individual

---

[62] See Docket No. 83-4 at 3–5.

[63] Id. at 10.

allegations of bad faith could withstand summary judgment.[64] Rust-Oleum has produced evidence negating subjective and objective bad faith on its part; and Polar has failed to come forward with specific facts demonstrating a genuine issue regarding the bad faith claims. Rust-Oleum is entitled to summary judgment on Polar's Claim 2 that Rust-Oleum breached the implied covenant of good faith and fair dealing.

Conclusion

For the foregoing reasons, Rust-Oleum's motion for summary judgment as to Polar's breach of contract Claim 1 and breach of the implied covenant of good faith and fair dealing Claim 2 is GRANTED.

Dated at Anchorage, Alaska, this 4th day of August, 2022.

/s/ H. Russel Holland
H. RUSSEL HOLLAND
Senior United States District Judge

---

[64] Docket 81 at 16.